**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ESTATE OF FRANCES D. DEROSA**, <br><br> Plaintiff, <br><br> v. <br><br> **GOVERNOR PHILLIP D. MURPHY**, *et al.*, <br><br> Defendants. | Civil Action No. 22-2301 (ZNQ) (TJB) <br><br> **OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon two Motions to Dismiss filed by Defendants Philip D. Murphy, Judith M. Persichilli (collectively, "State Defendants"), Gateway Care Center, LLC d/b/a Gateway Care Center n/k/a Shore Pointe Care Center, Jonathan Rosenberg, and Yehudah Kramer (collectively, "Gateway Defendants"). (ECF Nos. 6, 8.) The State Defendants filed a Moving Brief in support of their Motion to Dismiss. ("State Moving Br.", ECF No. 6-1.) The Gateway Defendants also filed a Moving Brief in support of their Motion to Dismiss. ("Gateway Moving Br.", ECF No. 8-1.) Plaintiff the Estate of Frances D. DeRosa by and through her Administrator *ad prosequendum*, Lisa DeRosa-Palisi (the "Estate" or "Plaintiff") filed an Opposition to both the State Defendants' Motions to Dismiss ("State Opp'n", ECF No. 12) and the Gateway Defendants' Motions to Dismiss ("Gateway Opp'n", ECF No. 13). Both the State Defendants ("State Reply", ECF No. 19) and the Gateway Defendants ("Gateway Reply", ECF No. 20) replied to Plaintiff's respective Oppositions.

1

The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT the State Defendant's Motion to Dismiss without prejudice and DENY the Gateway Defendant's Motion to Dismiss.

I.      **BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff initiated the instant action on April 20, 2022 by filing her Complaint. ("Compl.", ECF No. 1.) The Complaint generally alleges constitutional violations against the Defendants in their responses to the COVID-19 pandemic. (*See generally, id.*)

Specifically, Plaintiff alleges that Frances DeRosa ("Frances" or "Decedent"), decedent, a resident of Gateway,[1] was diagnosed with COVID-19 ("COVID") on April 20, 2020, and died of COVID on April 27, 2020 at the age of 73. (*Id.* ¶ 1.) On March 9, 2020, Defendant-Governor Murphy issued Executive Order No. 103 ("EO 103") declaring a Public Health Emergency in New Jersey as a result of the COVID-19 pandemic. (*Id.* ¶ 8.) In conjunction with the implementation of EO 103, on March 31, 2020, Commissioner Persichilli issued a Directive entitled "Hospital Discharges and Admissions to Post-Acute Care Settings" ("the Directive"). (*Id.* ¶ 9.) The Directive ordered that post-acute care facilities such as Gateway are expressly prohibited from denying admission or re-admission of patients/residents who have tested positive for COVID. (*Id.* ¶ 10.) During a conference call immediately after the issuance of the Directive, the Defendants were warned that the Directive might prove to be dangerous. (*See id.* ¶ 11.) The day after the conference call, the New Jersey Department of Health was inundated with calls from 99 facilities stating that they did not have enough resources to properly staff or separate patients. (*Id.* ¶ 16.)

---

[1] Gateway Care Center, LLC d/b/a Gateway Care Center n/k/a Shore Pointe Care Center ("Gateway") was the licensed owner/operator of that certain licensed nursing home, long term health care facility and/or a nursing facility commonly known as Gateway Care Center. (Compl. ¶ 4.)

Within a week, 200 facilities notified the New Jersey Department of Health that they could not accept new admissions. (*Id.*) Just a day after Commissioner Persichilli issued the Directive, three national organizations publicly urged other states not to enforce the kind of policy being implemented by the Directive and instead advocated for the creation of separate settings for recovering COVID patients, including large field hospitals, dormitories, hotels, and shuttered nursing homes or hospitals. (*Id.* ¶¶ 17–20.)

On or about March 12, 2020, Lisa DeRosa-Palisi—Plaintiff Administrator *ad prosequendum* and daughter of Frances—returned with her mother from a visit at Gateway. (*Id.* ¶ 52.) After her visit, Gateway's Administrator, Jay Kramer, advised Plaintiff that the State of New Jersey was ordering a shutdown of the Facility due to the fear of COVID. (*Id.* ¶ 53.) Plaintiff asked to view the directive that came from Medicare/Medicaid. (*Id.* ¶ 54.) Plaintiff alleges that "the printout clearly said that if a resident had a family member who visited on a regular basis (Lisa was at Gateway a minimum of 5 days a week) and was important to the resident's mental well-being (Frances was also being treated for Schizophrenia, and both Plaintiff and Gateway knew that no visits from Plaintiff would be devastating for Frances), special arrangements could be made for that resident and visitor." (*Id.*) Plaintiff expressed disagreement with this new policy but was told that Gateway employs "'trained professionals' and that Plaintiff would be more of a danger to Frances then Gateway would be." (*Id.* ¶¶ 55–57.) Kramer assured Plaintiff that Gateway would be taking extra precautions. (*Id.* ¶ 58.)

Through the first two weeks of lockdown, Frances reported to Plaintiff that Gateway was doing none of what they had told Plaintiff they were going to do in terms of implementing the necessary protective measures against the virus. (*Id.* ¶ 60.) On March 31, 2020, the Directive was issued, ordering that post-acute care facilities such as Gateway, were expressly prohibited from

3

denying admission or re-admission of patients/residents who have tested positive for COVID, while also prohibiting post-acute care facilities from requiring a hospitalized patients/residents who were determined to be "medically stable", to be tested for COVID prior to admission/re-admission. (*Id.* ¶ 62.) On April 10, 2020, Plaintiff was informed that Frances was showing signs of COVID, but Gateway was not sure if it was only "seasonal allergies." (*Id.* ¶ 64.) Plaintiff demanded that Frances be tested for COVID. (*Id.*) Plaintiff was told that the CDC would not allow Gateway to test Frances, and prevented Plaintiff from taking Frances herself to get tested by threatening to deny her re-admission into Gateway. (*Id.* ¶ 65.) Plaintiff asked Gateway three times over the next week to test Frances, but they would not do so. (*Id.* ¶ 66.) Finally, when Frances was not doing well on April 17, 2020, Gateway had her tested seven days after informing Plaintiff that Frances may be sick. (*Id.*) Three days later, on April 20, 2020, Plaintiff learned that Frances tested positive for COVID. (*Id.* ¶ 67.) Frances was not admitted to a hospital. (*Id.*) Gateway claimed to be isolating and treating Frances at the Facility. (*Id.* ¶ 68.) On April 24, 2020, Plaintiff received a call that Frances's oxygen levels were dropping, and she needed to go to the emergency room. (*Id.*) Seven days later, Frances died from COVID. (*Id.*) Plaintiff subsequently filed the five-count Complaint alleging 42 U.S.C. § 1983 (Count I) and N.J.S.A. 10:6-2(c) violations (Count II) against the State Defendants and violations of the New Jersey Nursing Home Resident Rights Act (Count III), Gross Negligence (Count IV), and Wrongful Death (Count V) against the Gateway Defendants.

## II. **JURISDICTION**

The Court has jurisdiction over Plaintiff's § 1983 claims under 28 U.S.C. § 1331, and jurisdiction over the state law claims under 28 U.S.C. § 1367.

### III.     LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability

requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. (quotations and brackets omitted).

## IV.   DISCUSSION

### A.   STATE DEFENDANTS

Plaintiff alleges two counts against the State Defendants—42 U.S.C. § 1983 violations (Count I) and N.J.S.A. 10:6-2(c) violations (Count II). Specifically, Plaintiff alleges that the State Defendants acted under the color of state law when they Frances of her guaranteed right to life pursuant to the Fifth and Fourteenth Amendments of the United States Constitution as well as New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c). (Compl. ¶¶ 79–80, 94.) In opposition, the State Defendants argue that they are entitled to qualified immunity because the actions at issue were reasonable and violated no clearly established law. (State Opp'n at 12.)

Because the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2(c), "was modeled after § 1983," courts interpret state-law claims based on the same underlying rights (such as Plaintiffs' claims here) "analogously." *Castro v. New Jersey*, 521 F. Supp. 3d 509, 517 (D.N.J. 2021), *appeal*

*dismissed sub nom. Castro v. Cnty of Atlantic*, Civ. No. 21-1578, 2021 WL 7710069 (3d Cir. Oct. 28, 2021). The Court will therefore do the same.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct," *Reichle v. Howards*, 566 U.S. 658, 664 (2012). The party asserting qualified immunity has the burden of establishing that the doctrine applies. *See Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010). The qualified immunity analysis generally has two prongs, which a court may address in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). One prong asks whether the facts that the plaintiff has alleged or shown make out a violation of a statutory or constitutional right. *Id*. at 232. The other prong asks whether the plaintiff's asserted right was clearly established at the time of the challenged conduct. *Id*. The latter prong "is an objective inquiry, to be decided by the court as a matter of law." *Doe v. Groody*, 361 F.3d 232, 238 (3d Cir. 2004). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

"[T]he burden is on the defendants to establish they are entitled to qualified immunity." *E. D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019). "Officials demonstrate they are entitled to qualified immunity only if they can show that a reasonable person in their position at the relevant time could have believed, in light of clearly established law, that their conduct comported with recognized legal standards." *Id*. As to the second prong, "[t]he inquiry focuses on the state of the relevant law when the violation allegedly occurred." *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 570 (3d Cir. 2017). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018). Stated

simply, the rule must be "settled law." *Id*. A principle is settled law if it is dictated by "controlling authority" or a "consensus of cases of persuasive authority." *Id*. at 589-90. "It is not enough that the rule is suggested by then-existing precedent." *Id*. at 590. Rather, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id*.

Here, those two elements require Plaintiff to plausibly allege that it was clearly established in March and April of 2020 that, under the uncertainty and the difficult balancing of interests required at that time, it violated substantive due process for an official to enact a policy like the Directive in order to ensure that the State had sufficient hospital beds and other resources to meet the demand of the crush of patients who were expected to need acute care as a result of a rapidly spreading, novel, and deadly virus. The Directive provided in relevant part:

> In order to respond to the increase in positive cases there is an urgent need to expand hospital capacity to be able to meet the demand for patients with COVID-19 requiring acute care. . . .
>
> During this global health emergency, all post-acute care settings must comply with the expedited receipt of patients/residents discharging from hospitals. Patients/residents are deemed appropriate for discharge to the post-acute care setting upon a determination by the hospital physician or designee that the resident is medically stable for return. A rapid review of necessary resources to provide adequate, safe care in the post-acute care setting is imperative during this time.
>
> Hospital discharge planners must confirm to the post-acute care setting, by telephone, that the patient/resident is medically stable for discharge. Comprehensive discharge instructions must be provided by the hospital prior to the transport of a patient/resident to the post-acute care setting.
>
> No patient/resident shall be denied re-admission or admission to the post-acute care setting solely based on a confirmed diagnosis of COVID-19. Persons under investigation for COVID-19 who have undergone testing in the hospital shall not be discharged until results are available. Post-acute care facilities are prohibited from requiring

8

> a hospitalized patient/resident who is determined medically stable
> to be tested for COVID-19 prior to admission or readmission.

Judith M. Persichilli, Comm'r, "Hospital Discharges and Admissions to Post-Acute Care Settings," Mar. 31, 2020.[2] Plaintiff alleges that the State Defendants violated Frances's constitutional right to life, protected by substantive due process under the Fifth and Fourteenth Amendments of the U.S. Constitution and its New Jersey corollary. (Compl. ¶¶ 78–95.) To succeed at this stage and in this context, a substantive due process claim must plausibly allege not simply that the government has made a bad choice, but rather that it has "has abused its power in an arbitrary manner that 'shocks the conscience.'" *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (quoting *Cnty of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)). This rule "points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability"; it does not impose "liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848.

Here, Plaintiff fails to plead a clearly established right at the time of the challenged conduct. "[T]he clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). Thus, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 1566 U.S. 658, 664 (2012)). A right is clearly established when precedent exists that is like the case at hand, although the facts of the precedent do not need to be "materially similar." *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While there is no need for a "case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate," and the "violative nature

---

[2] https://nj.gov/health/legal/covid19/3-31-2020%20Hospital%20Discharges%20and%20Admissions%20to%20PostAcute%20Care%20Settings.pdf.

9

of particular conduct" must not be defined at a "high level of generality." *See Ashcroft v. Al-Kidd*, 563 U.S. 731, 741-42 (2011). To determine whether a right is clearly established, the Court will "look first for 'applicable Supreme Court precedent.' If none exists, [the Court must] consider whether there is a case of controlling authority in our jurisdiction or a 'robust consensus of cases of persuasive authority in the Courts of Appeals that could clearly establish a right for purposes of qualified immunity.'" *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) (citing *Mammaro*, 814 F.3d at 169).

Plaintiff asserts violations of constitutional rights under the Fifth and Fourteenth Amendments and the New Jersey State Constitution, however, the Court is not persuaded that the contours of these rights are sufficiently particular to the circumstances at hand such that a reasonable officer understood what he or she did to violate those rights. The particular right at issue—the right to life in the context of an infectious disease—has never been recognized, let alone addressed by courts. "The . . . mandates were implemented in the throes of a rare, once-in-a-century global health crisis for which guidance has constantly evolved. It follows then that it was not sufficiently clear to a reasonable official that what he or she was doing violated that right." *Wright-Gottshall v. New Jersey*, Civ. No. 21-18954, 2023 WL 3183288, at *8 (D.N.J. May 1, 2023). Because the clearly established standard has not been satisfied, the Court need not decide whether the alleged facts make out a violation of a constitutional right. *See Zaloga v. Borough of Moosic*, 841 F.3d 170, 174 (3d Cir. 2016) (declining to conduct any analysis on the first prong where the second prong was not met).

Still, the Court further finds that Plaintiff also fails to allege a violation of a constitutional right. Plaintiff specifically alleges that Frances was deprived of her "fundamental right to life without due process of law" pursuant to the Fifth and Fourteenth Amendment of the Constitution

10

as well as N.J.S.A. 10:6-2(c). (Compl. ¶¶ 84, 94.) Presumably, Plaintiff makes this allegation because Frances allegedly passed away from COVID as a direct result of the Directive's poor planning. Plaintiff's constitutional "right to life" argument must fail. "The Fifth Amendment states, in relevant part, no person 'shall be compelled in any criminal case to be a witness against himself nor be deprived of life, liberty, or property, without due process of law...'" *Spence v. Astrue*, Civ. No. 19-3031, 2019 WL 6218264, at *3 n.2 (E.D. Pa. Nov. 20, 2019) (quoting U.S. Const. V). The present matter is not a criminal proceeding calling for the death penalty, hence, [the State Defendant's Directive] does not impact her "right to life." Plaintiff offers no precedent to the contrary. (Compl. ¶ 84.) Plaintiff cites *Washington v. Glucksberg*, 521 U.S. 702, 710 (1997), but that was a case about assisted-suicide prohibitions, *see id.* Plaintiff cites *Cruzan ex rel. Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 281 (1990), but that was a case about parents' ability to withdraw life-saving treatment from a child in "a persistent vegetative state," *id.* at 265–66. Plaintiff also cites *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943), but that was a case about whether schools can force students to salute the American flag, *id.* at 626–30. Plaintiff ultimately ignores the longstanding legal guidance about government decision-making in the midst of a public-health crisis which provides that, because of state officials' duty "to guard and protect" the "safety and the health of the people," they are permitted to take actions they deem necessary so long as those actions have at least some "real or substantial relation" to the crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *See Jacobson v. Massachusetts*, 197 U.S. 11, 28 (1905). In light of Plaintiff's failure to allege that the State Defendants violated a clearly established right and to allege a constitutional violation, the State Defendants are entitled to qualified immunity. Accordingly, the Court will grant the State Defendants' motion to dismiss without prejudice.

### B. GATEWAY DEFENDANTS

Counts III–V of the Complaint—violations of the New Jersey Nursing Home Resident Rights Act (Count III), Gross Negligence (Count IV), and Wrongful Death (Count V)—allege claims against the Gateway Defendants. Specifically, Plaintiff alleges that the Gateway Defendants did not utilize PPE, did not test Decedent for COVID, and did not send Decedent to the hospital when she tested positive for COVID. (Compl. ¶¶ 64–67.) Plaintiff also asserts multiple claims of gross negligence, contending that the Gateway Defendants failed to test Decedent for COVID after she began exhibiting symptoms, prohibited Plaintiff from taking Decedent to get tested, and failed to separate staff and residents who had tested positive. (*Id.* ¶¶ 71–74.) Plaintiff alleges that the Gateway Defendants allowed the nursing staff who were infected to continue caring for residents and prevented staff from gaining access to PPE. (*Id.* ¶ 74.) Plaintiff also asserts claims for intentional misconduct, contending that the Gateway Defendants were in "deliberate breach" and abused Decedent in the form of "intentional deprivation of care, services, and resources." (*Id.* ¶¶ 74, 99). Plaintiff also alleged that the Gateway Defendants intentionally refused to provide PPE to staff and residents. (*Id.* ¶ 61.) In their Motion to Dismiss, the Gateway Defendants claim that Plaintiff's allegations which relate to the use, allocation, or administration of such resources are covered and subsequently barred under the PREP Act. (Gateway Moving Br. at 9.)

1. <u>The PREP Act</u>

In 2005, Congress passed the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. §§ 247d-6d, 247d-6e. *Estate of Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393, 400 (3d Cir. 2021). "The PREP Act protects certain covered individuals—such as pharmacies and drug manufacturers—from lawsuits during a public-health emergency." *Id.* The Act lies

dormant until invoked by the Secretary of the Department of Health and Human Services ("HHS"). *Id.* If the Secretary deems a health threat a public-health emergency, he may publish a declaration in the Federal Register recommending certain "covered countermeasures." *Id.* (citing § 247d-6d(b)(1)). When the Secretary makes such a declaration, the covered individuals become immune from suit and liability from claims related to the administration of a covered countermeasure. *Id.* (citing § 247d-6d(a)(1)).

In March 2020, the Secretary issued a declaration under the PREP Act, declaring that COVID-19 is a public-health emergency. *Id.* at 401. The Secretary recommended a series of covered countermeasures that includes drugs, devices, and products "used to treat, diagnose, cure, prevent, or mitigate COVID-19," subject to the PREP Act's definitions. *Id.* The Secretary has since amended the declaration seven times and the HHS has also issued advisory opinions and guidance letters on various issues related to the declaration. *Id.*

The Secretary controls the scope of immunity through the declaration and amendments, within the confines of the PREP Act. *Id.* A covered person enjoys immunity from all claims arising under federal or state law that relate to the use of a covered countermeasure. *Id.* (citing 42 U.S.C. § 247d-6d(a)(1)). Covered persons include manufacturers, distributors, program planners, and qualified persons, as well as their officials, agents, and employees. *Id..* (citing 85 Fed. Reg. at 15,201). The scope of immunity is broad. Covered persons are immune from "any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure." *Id.* (citing 42 U.S.C. § 247d-6d(a)(2)(B)). That includes claims relating to "the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure." *Id.*

13

Congress did not leave those injured by covered countermeasures without recourse. The Act establishes a fund to compensate "eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure." *Id*. (citing § 247d-6e(a)). The Secretary has broad authority to issue regulations determining who and what types of injuries qualify for compensation under the fund. *Id*. (citing § 247d-6e(b)(4)-(5)). There is one exception to this statutory immunity. The PREP Act provides "an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct." *Id*. (citing § 247d-6d(d)(1)). "Willful misconduct" is in turn defined as "an act or omission that is taken—(i) intentionally to achieve a wrongful purpose; (ii) knowingly without legal or factual justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit." *Id*. (citing § 247d-6d(c)(1)(A)). The Act clarifies that willful misconduct "shall be construed as establishing a standard for liability that is more stringent than a standard of negligence in any form or recklessness." *Id*. (citing § 247d-6d(c)(1)(B)). Notwithstanding the statutory definition, the Secretary may issue regulations that further restrict what acts or omissions qualify as willful misconduct. *Id*. (citing § 247d-6d(c)(2)(A)).

Despite the Gateway Defendants' contentions to contrary, "just because the PREP Act creates an exclusive federal cause of action does not mean it completely preempts the estates' state-law claims." *Id.* at 410. To determine whether Plaintiff's state-law claims fall within the scope of the exclusive federal cause of action, the Court "must determine whether [Plaintiff] could have brought their claims under the PREP Act's cause of action for willful misconduct." *Id.* Although the Gateway Defendants argue that Plaintiff's claims are for willful misconduct, and correctly enumerate the elements of willful misconduct, Plaintiff—like the plaintiffs in *Maglioli*—

14

asserts counts of negligence and punitive damages, not willful misconduct. A claim for negligence under New Jersey law requires the familiar elements of duty, breach, causation, and damages. *Id.* at 411 (citing *Townsend v. Pierre*, 221 N.J. 36, 110 (N.J. 2015)). In contrast, a claim for willful misconduct under the PREP Act requires wrongful intent, knowledge that the act lacked legal or factual justification, and disregard of a "known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit." *Id.* (citing 42 U.S.C. § 247d-6d(c)(1)(A)). The rule of construction removes any doubt: the PREP Act's cause of action for willful misconduct "establish[es] a standard for liability that is more stringent than a standard of negligence in any form or recklessness." *Id.* (citing § 247d-6d(c)(1)(B)).

"Willful misconduct is a separate cause of action from negligence." *Id.* The elements of the state cause of action need not "precisely duplicate" the elements of the federal cause of action for complete preemption to apply. *Id.* But complete preemption does not apply when federal law creates an entirely different cause of action from the state claims in the complaint. *Id.* (citing *DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 452-53 (3d Cir. 2003)). Congress could have created a cause of action for negligence or general tort liability, but it did not. *Id.* Just as intentional torts, strict liability, and negligence are independent causes of action, so too willful misconduct under the PREP Act is an independent cause of action. The question therefore is whether Plaintiff's allegations fall within the scope of the PREP Act's cause of action—"that is, whether the claims could have been brought under that section." *Id.* But nowhere in the Complaint does Plaintiff allege or imply that the nursing homes acted "intentionally to achieve a wrongful purpose." *Id.* (citing 42 U.S.C. § 247d-6d(c)(1)(A)(i)). Nor does Plaintiff claim that the Gateway Defendants acted "knowingly without legal or factual justification." *Id.* (citing § 247d-6d(c)(1)(A)(ii)). As Gateway Defendants observe, "[a]t most, the allegations contained in the

15

Complaint amount to ordinary negligence claim." (Gateway Moving Br. at 25.) Thus, because Plaintiff did not allege a willful misconduct claim, the PREP Act does not bar Counts III–V of the Complaint.

    2. <u>New Jersey COVID-19 Immunity Statute</u>

The Gateway Defendants next argue that the New Jersey COVID-19 Immunity Statute bars Plaintiff's Complaint. (Gateway Moving Br. at 9.) The Gateway Defendants cite two New Jersey Law Division cases in support of their contention that Plaintiff's Complaint is barred by New Jersey's COVID-19 Immunity Statute: *Pantoliano v. Care One at Wellington*, BER-L-2226-22 (August 2, 2022) and *Estate of Whitehurst v. Hallmark Health Care, LLC*, MRS-L-678-22 (August 22, 2022). Both of those cases recognize that pursuant to L. 2020, c. 18 § 1(c), there is an exception to P.L. 2020, Ch.18 for acts of omissions constituting gross negligence. *Id.* at 12; *Id.* at 2. Moreover, although the Gateway Defendants attempt to liken this matter to these two cases, both suits were dismissed because the plaintiffs failed to state claims for gross negligence. That is not the case here.

Accepting the allegations of the Complaint as true, Plaintiff has sufficiently pled all three of its claims against the Gateway Defendants. As noted above, a claim for negligence under New Jersey law requires the familiar elements of duty, breach, causation, and damages. *Maglioli* at 411. A claim for "gross negligence" is essentially a negligence claim directed at the "upper reaches of negligent conduct." *Stelluti v. Casapenn Enterprises, LLC*, 408 N.J. Super. 435, 457 n.6 (App. Div. 2009). Plaintiff pleads that it was the Gateway Defendants' responsibility to take care of Frances (Compl. ¶ 66), they breached their duty to care for Frances by neglecting to implement safety measures during the COVID-19 pandemic (*id.* ¶¶ 71–75) which caused Frances to contract COVID and ultimately pass away (*id.* ¶ 107). *See Powell v. Seton Hall Univ.*, Civ. No. 21-13709,

16

2022 WL 1224959, at *5 (D.N.J. Apr. 26, 2022) (finding that the plaintiff sufficiently pled a gross negligence claim by pleading that the defendant university neglected to provide effective treatment following a knee injury.) Regarding punitive damages, the Complaint states that "Plaintiff brings this claim pursuant to the provisions of the New Jersey Wrongful Death Act, N.J.S.A. 2A:31-1 et. seq., for the benefit of the next of kin of Frances, pursuant to N.J.S.A. 2A:15-3." (Compl. ¶ 109). While punitive damages are not available for gross negligence, under the Survivor's Act, N.J.S.A. 2A:15–3 a claim for punitive damages may be sustained even absent an award of compensatory damages for pain and suffering. *Smith v. Whitaker*, 160 N.J. 221, 243 (1999). Accordingly, Counts III–V of the Complaint alleging gross negligence, wrongful death, and punitive damages all survive the Gateway Defendants' Motion to Dismiss.

## V.   CONCLUSION

For the reasons stated above, the Court will GRANT the State Defendant's Motion to Dismiss without prejudice and DENY the Gateway Defendant's Motion to Dismiss. Plaintiffs will be given leave to file an Amended Complaint, limited to an attempt to cure the defects noted in this Opinion, within 30 days. Failure to cure the defects noted in this Opinion may lead to dismissal with prejudice. An appropriate Order will follow.

Date: **May 12, 2023**

s/ Zahid N. Quraishi<br>
**ZAHID N. QURAISHI**<br>
**UNITED STATES DISTRICT JUDGE**